1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JERRY SPICER,

          Plaintiff,

    v.

DR. HENRY RICHARDS,

          Defendant.

Case No. C07-5109 FDB/KLS

REPORT AND RECOMMENDATION

**Noted For: August 1, 2008**

      Presently before the Court is the motion for summary judgment of Defendant Dr. Henry Richard.  (Dkt. # 34).  Defendant claims that he is entitled to summary judgment dismissal of Plaintiff's remaining claims[1] as Plaintiff cannot show a constitutional violation.   In support of his motion, Dr. Richards submits the Declarations of Dr. Richards, Chaplin Greg Duncan, Cathi Harris, Paul Temposky and Al Nerio.  (Dkts. # 35-39).  Plaintiff opposes the motion (Dkt. # 43) and submits the deposition of Dr. Richards in support.  (Dkt. # 43, Exh. 1)[2].  Dr. Richards filed a reply.  (Dkt. #

---

    [1]The court previously granted summary judgment dismissal of two issues raised in Plaintiff's complaint relating to SCC's privilege level system and sexually explicit materials policies.  *See* Report & Recommendation (Dkt. # 24) and Order Adopting R&R (Dkt. # 27).

    [2]A reviewed and approved copy of Defendant's deposition transcript may also be found at Dkt. # 46-2.

REPORT AND RECOMMENDATION - 1

45).    After careful review of the parties' papers and summary judgment evidence, the court

recommends that Defendant's motion for summary judgment be granted.

## I.  BACKGROUND FACTS AND CLAIMS ASSERTED

Mr. Spicer is a resident of the Special Commitment Center (SCC).  (Dkt. # 6).  The SCC is

a Washington Department of Social and Health Services (DSHS) facility for the care and

treatment of persons detained or civilly committed under Wash. Rev. Code ch. 71.09,

Washington's sexually violent predator statute. (Dkt. # 35, p. 1).  Plaintiff was admitted to the

SCC on April 28, 2005.  *Id.*  Dr. Richards is SCC's Superintendent. *Id.*

Mr. Spicer alleges that Dr. Richards violated his rights during his confinement at the SCC

regarding (1) possession of specific property within SCC's total confinement treatment facility

(i.e., cellular telephone, pager, computer, and computer color print cartridge) (Dkt. # 6, ¶¶ 9, 11-

15); (2) the ambient noise level and temperature of meals served in the SCC resident dining room,

*Id.* ¶ 16; (3) lack of "trailer visits" (i.e., "conjugal" or "contact" visits) at SCC, *Id.* ¶ 10; (4)

insufficient telephone access, *Id.*, ¶ 12; (5) interference with his "religious ministry" to other

SCC residents, *Id.*, ¶ 18, and (6) conditions of confinement that are "worse" than prison because

he is now being held in "maximum" custody. *Id.*, ¶ 17.

## II.  STANDARD OF REVIEW

Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law.  Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(c).  In deciding

whether summary judgment should be granted, the court must view the record in the light most

favorable to the nonmoving party and indulge all inferences favorable to that party. Fed. R. Civ.

P. 56(c) and (e).  When a summary judgment motion is supported as provided in Fed. R. Civ. P.

REPORT AND RECOMMENDATION - 2

56, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in Fed. R. Civ. P. 56, must set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e).  If the nonmoving party does not so respond, summary judgment, if appropriate, shall be rendered against that party. *Id.*

The moving party must demonstrate the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude summary judgment. *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).  A "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit," and the materiality of which is "determined by the substantive law governing the claim." *T.W. Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

### III.  SUMMARY JUDGMENT FACTS

Dr. Richard provides the following background facts regarding SCC's treatment program and conditions of confinement, which are disputed by Mr. Spicer.

**A.   Background Facts**

The SCC is a total confinement, treatment facility for persons whom a state court has either committed or found probable cause to detain as sexually violent predators. Wash. Rev. Code § 71.09.020(13).  A sexually violent predator is a person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder that makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility. Wash. Rev. Code 71.09.020(16).

Plaintiff is a pre-commitment detainee at the SCC, following a state court's finding of

REPORT AND RECOMMENDATION - 3

probable cause to believe that he is a sexually violent predator.  (Dkt. # 35, p. 2, Attach. A).

**A.      The SCC's Treatment Program**

**1.      "Trailer" (Conjugal) Visits**

Conjugal (also known as "intimate contact" or "trailer") visits are available on a case-by-case basis to residents who have progressed through treatment and have graduated to a less restrictive alternative (LRA) to the total confinement facility, when approved by the Community Programs Administrator and the court of commitment. *Id.*, Dkt. # 34, Exh. 2 (Policy 285, Resident Marriage, ¶ IX).

Conjugal visits are not available to residents of the total confinement treatment facility as it has been determined by the SCC senior clinical team and Dr. Richards that such visits would present significant security concerns in view of the characteristics that define the SCC population. *Id.*, ¶ 4.  All SCC residents have committed previous acts of sexual violence, are diagnosed with a mental disorder, and have been committed or a court has found probable cause to believe that each is more likely than not to commit future acts of sexual violence if not confined to a secure facility. *Id.*

If such visits were permitted in the future, the privilege would likely be limited to residents who actively participate in the sex offender treatment offered at the SCC.  *Id.*  As Mr. Spicer declines to participate in the sex offender treatment available to him at the SCC (Dkt. # 6, ¶ 5), the privilege would likely not be available to him were it offered in the future.  (Dkt. # 35, ¶ 4).

**2. Personal Property**

The SCC has policies regarding possession of personal property at the SCC.  (Dkt. # 34, Exhs. 3 and 4).  The SCC has had ongoing concerns about the use and possession of electronic

REPORT AND RECOMMENDATION - 4

contraband, including the possession of illegal pornographic images, sexually explicit images, and residents using their computers to create near-replicas of SCC policies and other official documents.  (Dkt. # 35, ¶  6).  In the past, residents have attempted to pass off as genuine near replicas of official documents in pleadings filed in court, including this Court. *Id*.; See also, *Higgins v. Richards*, 2006 WL 3064963 * 7 (W.D. Wash., October 26, 2006), *aff'd* 258 Fed.Appx. 164 C.A.9 (Wash., 2007); *Hoisington v. Richards* 2006 WL 3064960 * 7 (W.D. Wash., October 26, 2006), *aff'd* 258 Fed.Appx. 165 C.A.9 (Wash. 2007).

Several residents have managed to hide and store illegal pornography on their computers. *Id*., ¶ 7.  A number of residents have been criminally convicted of or charged with the possession of illegal pornography. *Id*.  To curb this counter-therapeutic abuse, SCC has developed policies that allow only one type of computer that residents may possess within the total confinement facility. *Id*.

The SCC management team concluded that residents may not possess cellular telephones and other wireless devices used to access the Internet as this detracts from the therapeutic treatment environment, and creates a risk to the safety and security to SCC's residents, staff, visitors, and the public. (Dkt. # 35, ¶ 5).   Wireless devices may also be used to engage in illegal activity, including attempting to arrange for the introduction of contraband (including e.g., sexually explicit materials, illegal drugs, and alcohol) into the institution. *Id*.

### 3.    Daily Bible Readings

The SCC supports residents' appropriate religious exercise. (Dkt. # 36, ¶ 2; Dkt. # 34, Exhs. 2, 6-10).  Religious activities and programs are under the direction of the SCC chaplain. (Dkt. # 36, ¶ 2).  The chaplain maintains financial accounts for SCC's various faith groups. *Id*. Residents may make financial donations to the accounts which the chaplain manages. *Id*.  A

REPORT AND RECOMMENDATION - 5

chaplain or community volunteer must supervise residents who wish to meet as a group for religious purposes unless the Superintendent otherwise approves. *Id.*, ¶ 3.

Staff supervises religious group meetings to maintain a therapeutic treatment environment, to protect vulnerable or special needs residents from other resident's exploitation guised as religious activities, and to avoid religious meetings being used as a ruse to undermine the safety and security of SCC residents and staff. *Id.* One of the purposes of the SCC's prohibition of residents giving gifts, cash or property to other residents is to avoid exploitation. *Id.*

Plaintiff has a history of sexually offending against female toddlers and assaulting developmentally disabled women.  (Dkt. # 37, ¶ 2, Attach. A, p. 3).  In 2003, Plaintiff entered the Sex Offender Treatment Program(SOTP) at Twin Rivers Correctional Center. In 2004, his SOTP treatment summary stated:

> Mr. Spicer has limited understanding of his risk factors and how to intervene on them.... He views himself as kind, gentle and misunderstood. He is drawn to people he can control such as minors or adults with developmental disabilities. He likes to present himself as a helper and has received the title of "Minister" from a mail order type organization.

Further, if plaintiff were to reoffend he would,

> . . . most likely gain access to his victim through his ministry; counseling single mothers, teenagers or developmentally delayed females. Mr. Spicer has failed to recognize in treatment how his "ministry" is a grooming tool and high risk and he has failed to demonstrate an understanding of his build up to his offending and his offending cycle.

*Id.*, pp. 5-6.

Plaintiff repeatedly has been observed engaging in grooming behaviors at SCC with vulnerable and special needs residents similar to those described *supra*. (Dkt. # 37, ¶ 3.  For example, on January 31, 2007, Plaintiff admitted that a vulnerable resident was having money his family and friends had sent him deposited into plaintiffs resident account. That resident

REPORT AND RECOMMENDATION - 6

would then ask plaintiff to purchase items for him. *Id.*  Plaintiff allegedly would complete a

Request for Transfer of Funds (RTF[3]) in Plaintiff's name, make the purchases, and then give

the item to the vulnerable resident. Plaintiff explained that he was simply "helping" the vulnerable

resident. *Id.*, Attach. B.  Plaintiff received a Behavioral Management Report (BMR[4]) and the

opportunity to attend a hearing to object to the BMR.  Plaintiff declined to attend the hearing and

the BMR was upheld. *Id.*, Attach. B.

On March 17, 2007, Plaintiff was observed accepting property from another resident in

violation of SCC's policy prohibiting residents from giving and receiving property. When

SCC staff confronted him, plaintiff said he was "trying to help another resident calm down."

*Id.*, ¶ 4.

Plaintiff has been counseled repeatedly regarding these behaviors and their similarity

to his offending patterns.  *Id.*, ¶ 4.  On February 8, 2007, Plaintiff was counseled that he must

coordinate his "ministry" through the SCC Chaplain.  *Id.*, Attach. D., p. 2.

On June 27, 2007, Plaintiff approached Chaplain Duncan to inquire how Plaintiff could set

up a non-profit organization/ministry to solicit donations from other residents which Plaintiff

would then control for "ministry" purposes. (Dkt. # 36, ¶ 4; Dkt. # 37, ¶ 5).  SCC treatment

professionals considered Plaintiff's actions clinically significant, demonstrating deviant

preoccupation consistent with his offending and grooming patterns. (Dkt. # 37, ¶ 6).

---

[3]SCC maintains trust accounts for each resident. When a resident wishes to make a purchase, s/he completes an RTF. The funds are then remitted to the vendor from which the resident wishes to make a purchase.  (Dkt. # 37, ¶ 3).

[4]A BMR is notice to the resident that s/he has violated an SCC policy or exhibited inappropriate behavior. Residents have the opportunity to object to a BMR in an administrative proceeding. (Dkt. # 37, ¶ 3, Attach. C).

REPORT AND RECOMMENDATION - 7

Because Plaintiff uses his "ministry" to engage in grooming behaviors with vulnerable residents, Plaintiff s treatment team has implemented a treatment plan intended to address these deviant behaviors. *Id*., ¶ 7.  Plaintiff remains able to coordinate his "ministry" through the Chaplain's office to limit Plaintiff's opportunity to use his "ministry" to groom others and yet retain his ability to engage in religious activity. *Id*.  He also is able to attend worship services coordinated through the Chaplain's office. *Id*. Dr. Richards did not participate in the clinical decision by Plaintiff's direct treatment team directing Plaintiff to coordinate his religious activities through the chaplain. (Dkt. # 35, ¶ 8).

**4.    SCC's Residential Program**

SCC's residential program is designed to provide a therapeutic treatment environment that supports sex offender treatment within a total confinement facility. (Dkt. # 35, ¶ 9).  SCC has separate living units, each with a separate mission. *Id*.  The living units are designed to house residents demonstrating behavior in need of low, medium, or high management structure, and those requiring assisted care or medical transition. *Id*.  The living units are similar to a college dormitory, with the capacity to house between 4 and 48 residents each. *Id*.  Each has a day room with large screen TVs, comfortable chairs and couches, board games, legal computers, and telephones for making personal and legal calls. *Id*.

Plaintiff currently lives on the lowest management level living unit, Redwood. *Id*.

**5.    Resident Dining Room**

SCC Food Service manager Paul Temposky manages SCC's Food Service Department. Dkt. # 38, ¶ 1.  Under Mr. Temposky's leadership, the SCC provides a heart healthy diet with a variety of menus that change approximately every four weeks.  *Id*., ¶ 3.  The Food Service Department adheres to health standards to ensure meals are prepared in a safe cooking

REPORT AND RECOMMENDATION - 8

environment, and that foods are kept at temperatures necessary to avoid food-borne illnesses. *Id*.

The Food Service Department is inspected regularly, including periodic visits from the Inspection

of Care Committee (IOCC), an external oversight body of surveyors with experience in operating

sex offender treatment programs, as well as a Western State Hospital dietitian. *Id*., SCC also has

its own dietitian who provides nutritional and dietary consultation for residents. *Id*.   The most

recent IOCC survey (October 2007) indicated that SCC's Food Service Department meets

expectations in all areas.  (Dkt. # 34, Exh. 11).

No legal standards exist regarding ambient noise levels in the resident dining room.

(Dkt. # 38, ¶ 4).  The SCC does not restrict residents from talking and socializing during meals.

*Id*.

The resident dining room has an occupancy capacity of 199 persons. *Id*., ¶ 5.  The dining room

has four exits, which include an unlocked emergency exit that leads into a fire escape down a

short hallway through the attached King Hall building, and two exits through the adjoining

kitchen and scullery.  *Id*. The SCC dining room has not been cited for being out of compliance

with fire codes. *Id*.  Plaintiff's SCC medical records do not reflect that he has sought medical care

for any

food borne illness while at the SCC.  (Dkt. # 37, ¶ 8).

## 6.   Resident Telephones

Plaintiff's bedroom is on the Redwood living unit. Redwood has 40 bedrooms in each

of two wings. Each wing has four telephones for resident use and two additional telephones for

residents to use when speaking with their attorneys or attending telephonic legal conferences.

(Dkt. # 39, ¶ 2).  If the unit telephones are in use, a resident's attorney may call the staff desk on

the living unit to speak to the resident. *Id*.

REPORT AND RECOMMENDATION - 9

# IV.  DISCUSSION

**A.     Standard of Proof Under 42 U.S.C. § 1983**

To state a claim under 42 U.S.C. § 1983, at least two elements must be met: (1) the defendant must be a person acting under color of state law, (2) and his conduct must have deprived the plaintiff of rights, privileges or immunities secured by the constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). Implicit in the second element is a third element of causation. *See Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 286-87, (1977); *Flores v. Pierce*, 617 F.2d 1386, 1390-91 (9th Cir. 1980), *cert. denied*, 449 U.S. 975 (1980). When a plaintiff fails to allege or establish one of the three elements, his complaint must be dismissed. The Civil Rights Act, 42 U.S.C. § 1983, is not merely a "font of tort law." *Parratt*, 451 U.S. at 532. That plaintiff may have suffered harm, even if due to another's negligent conduct, does not in itself, necessarily demonstrate an abridgment of constitutional protections. *Davidson v. Cannon*, 474 U.S. 344 (1986).

Plaintiff's claims may be broken down into two categories, those that fall under the protections afforded by the Fourteenth Amendment (substantive due process rights) and those that fall under the protections afforded by the First Amendment ("religious ministry" claim).

**B.     Fourteenth Amendment Substantive Due Process**

The Plaintiff's right to be protected and confined in a safe institution are clearly established.  *Youngberg v. Romeo*, 457 U.S. 307, 319-22 (1982) (stating that individuals who are involuntarily civilly committed have constitutionally protected rights under the due process clause to reasonably safe conditions of confinement).

Due process guarantees civilly detained sexually violent predators access to mental health treatment that provides them an opportunity to be cured or to improve the mental conditions for

REPORT AND RECOMMENDATION - 10

which they are confined.  *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 200) (citing *Ohlinger v. Watson*, 652 F.2d 775, 779 (9th Cir. 1980)).  A civilly detained person cannot be subject to conditions amounting to punishment but legitimate, non-punitive government interests include "effective management of a detention facility."  *See Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004).  States enjoy wide latitude in developing treatment regimens for these dangerous individuals.  *Kansas v. Hendricks*, 521 U.S. 346, 368 n. 4 (1997) (citing *Youngberg*, 457 U.S. at 317 and *Allen v. Illinois*, 478 U.S. 364, 373 (1986)).

In order to minimize the interference by the federal judiciary with the internal operations of state institutions, courts should show deference to the judgment exercised by a qualified professional. See *Youngberg,* 457 U.S. at 322.  A decision made by a professional is presumptively valid, and "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  *Id*. at 323.  "[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised.  It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made."  *Id*. at 321.

However, courts may take action when there is a substantial departure from accepted professional judgment or when there has been no exercise of professional judgment at all.  *Sharp*, 233 F.3d at 1171-72 (citing *Thomas S. by Brooks v. Flaherty*, 902 F.2d 250, 252 (4th Cir. 1990)).

With these basic principles in mind, the court turns to Plaintiff's specific allegations.

**(1)       Possession of Cell Phone, Computer Equipment**

Mr. Spicer complains that he is not allowed to own a cell phone, pager, computer, color ink cartridge printer and that there is no institutional justification for this prohibition.  (Dkt. # 6, p.

REPORT AND RECOMMENDATION - 11

3).

In response, Dr. Richards has proffered evidence of SCC's policies, which direct what a resident may possess within SCC's treatment facility.   (Dkt. # 34, Exhs. 3 and 4)[5].   Dr. Richards also states that he and the SCC management team banned possession of cellular telephones, pagers, color printers and scanners within the facility based on their professional judgment that such devices detract from a therapeutic treatment environment and create a security risk as the devices may be used to access victims, engage in illegal activity (viewing and storage of pornography) and introduce contraband into the institution.  (Dkt. # 35, ¶ 5).

The evidence proffered by Dr. Richards demonstrates that SCC's ban on the possession of the electronic devices in question is reasonably related to the security and safety risks posed to SCC's residents, staff, visitors, and the public.

Conversely, Mr. Spicer has not proffered any evidence that Dr. Richards failed to exercise professional judgment in reaching the conclusion that these devices are inappropriate in a total confinement facility for sexually violent predators.  Nor has Mr. Spicer provided any authority for the proposition that he has a constitutional right to possess such items.

**(2)    Noise and Food**

Plaintiff claims that he "has to eat in a very noisy chow hall with insufficient exits and the food is more often then [sic] not only just warm or at time [sic] cool."  (Dkt. # 6, ¶ 4).

"[P]ublic conceptions of decency inherent in the Eighth Amendment[6] require that

---

[5]Defendant points out that although Mr. Spicer claims that his right to purchase these items is being infringed, SCC as no policy preventing a resident from *purchasing* such items nor any policy directing what property a resident may own outside the facility.  SCC's policies direct only what a resident may possess within the SCC's treatment facility.  (Dkt. # 34, p. 14).

[6]Although the more generous Fourteenth Amendment standards apply to those who are civilly confined, the Eighth Amendment provides a floor for the level of protection that sexually

[inmates] be housed in an environment that, if not quiet, is at least reasonably free of excess noise."  *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996), *amended by* 135 F.3d 1318 (9th Cir. 1998).

The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing."  *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993); *See also Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000); *Keenan*, 83 F.3d at 1091.  "The fact that the food . . . sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation."  *LeMaire*, 12 F.3d at 1456 (citation and internal quotations omitted).

Plaintiff argues that excessive noise "inflicts pain without penological justification" and that "prison food must be nutritionally adequate."  (Dkt. # 43,p. 11)  However, he offers no summary judgment proof that he is being subjected to excessive noise or nutritionally inadequate food.

On the other hand, Dr. Richards provides the declaration of Paul Temposky, the Food Services Program Manager of the SCC, who states that the SCC resident dining room does not restrict residents from talking and socializing during meals, but that staff intervenes to diffuse situations that may arise if a resident behaves disruptively.  (Dkt. # 38, ¶ 4).  Mr. Temposky also attests to the amount of exits, including an unlocked emergency exit leading into a fire escape and that the SCC dining room has not been cited as being out of compliance with fire codes.  *Id*., ¶ 5.  In addition, there is evidence that the most recent IOCC survey (October 2007) indicates that SCC's Food Service Department meets expectations in all areas.  (Dkt. # 34, Exh. 11)

violent predators must receive under the Fourteenth Amendment and because the contours of the Eighth Amendment are more defined, Eighth Amendment jurisprudence may provide helpful guidance as to the standards to be applied. See *Hydrick v. Hunter*, 500 F.3d 978, 997-98 (2007).

REPORT AND RECOMMENDATION - 13

With regard to food service, Mr. Temposky also states that the SCC provides a healthy heart diet with a variety of menus adhering to health standards prepared in a safe cooking environment that are kept at temperatures to avoid food-borne illnesses.  (Dkt. # 38, ¶ 3).  The SCC Food Service Department has its own dietitian and is inspected regularly, including periodic visits from the Inspection of Care Committee and the Western State Hospital dietitian.  *Id*.  SCC's Associate Superintendent also confirms that Mr. Spicer has never sought medical attention relating to any food borne illness.  (Dkt. # 37, ¶ 8).

The uncontroverted evidence offered by Dr. Richards demonstrates that the SCC has not violated Mr. Spicer's constitutional rights with regard to the noise levels or the temperature of the food served in the dining room.

**(3)   "Trailer" or Conjugal Visits**

Mr. Spicer's claim that he is entitled to conjugal visits at SCC is premised on the fact that as "an inmate at DOC he could [participate in such a program]."  (Dkt. # 6, p. 3).  Mr. Spicer argues that SCC's policy against conjugal visits could not pose a risk to security as "most residents participated in the program during their prison sentence" and the "Department of Corrections has had numerous incidents in the trailer program, however it has not rescinded it's program."  (Dkt. # 43, p. 8).

It is well established, within the prison context, that there is no constitutional right to extended family ("trailer," contact, or conjugal) visits.  *Hewitt v. Helms*, 459 U.S. 460, 468 (1983); *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 461; *Toussaint v. McCarthy*, 801 F.2d 1080, 1113 (9th Cir. 1986), cert. denied, 481 U.S. 1069 (1987); *Block v. Rutherford*, 468 U.S. 576, 586 (1984) (The rational connection between a ban on contact visits and internal security of a detention facility is too obvious to warrant discussion.)

REPORT AND RECOMMENDATION - 14

In addition, Dr. Richards' summary judgment evidence reflects that the state's restrictions on conjugal visits for SCC patients is rationally related to the legitimate objectives of security and treatment of civilly committed sex offenders.

Dr. Richards states that he and the SCC senior clinical team have determined that conjugal visits shall not be made available to residents of the total confinement treatment facility as such visits would present significant security concerns in view of the characteristics of the SCC population; all SCC residents have committed previous acts of sexual violence and have been committed or a court has found probable cause to believe that each resident is more likely than not to commit future acts of sexual violence if not confined to a secure facility.  (Dkt. # 35, ¶ 4).

Mr. Spicer has proffered no evidence which establishes that he has a constitutionally protected right to have conjugal visits.  *See Thompson*, 490 U.S. at 461.

**(4)    Sufficient Telephone Access**

Mr. Spicer does not allege that he is being denied access to a telephone, but alleges that "there are not enough phones on the unit to allow him adequate contact with family, lawyers and friends."  (Dkt. # 6, p. 3).

Dr. Richards has proffered the Declaration of Al Nerio, a Program Area Manager of the SCC, who states that the wing where Plaintiff's bedroom is located has four telephones for residents' use, and two additional telephones for inmates to use when speaking with their attorneys or for telephonic legal conferences. (Dkt. # 39, ¶ 2).  If the unit telephones are in use, a resident's attorney may call the staff desk on the living unit to speak to the resident. *Id*.

As Mr. Spicer has offered no evidence to the contrary and no evidence to support his

REPORT AND RECOMMENDATION - 15

1   assertion that this telephone access is "inadequate," he has shown no constitutional violation.[7]

2       **(5)   Conditions "Worse Than Prison"**

3       Mr. Spicer alleges that his conditions of confinement are worse than they were when he

4   was in prison as he is housed in a "maximum custody level facility." (Dkt. # 6, p. 4).   Mr. Spicer

5   also argues in his response that the SCC has only a maximum classification status and sex

6   offenders are limited to vocational incentives while offenders housed within the DOC are not, a

7   distinction Mr. Spicer claims is unconstitutional. (Dkt. # 43, pp. 4-5)[8].

8

9       Dr. Richard's summary judgment evidence reflects that SCC's residential program is

10  designed to provide a therapeutic treatment environment that supports sex offender treatment

11  within a total confinement facility. (Dkt. # 35, ¶ 9).  SCC has separate living units, each with a

12  separate mission. *Id*.  The living units are designed to house residents demonstrating behavior in

13  need of low, medium, or high management structure, and those requiring assisted care or medical

14  transition. *Id*.  The living units are similar to a college dormitory, with the capacity to house

15  between 4 and 48 residents each. *Id*.  Each has a day room with large screen TVs, comfortable

16  chairs and couches, board games, legal computers, and telephones for making personal and legal

17  calls. *Id*.

18

19      Plaintiff currently lives on the lowest management level living unit, Redwood. *Id*.

20

21      Plaintiff offers no evidence to dispute the summary judgment evidence offered by Dr.

22

23      [7]To the extent Plaintiff is attempting to allege that he was denied meaningful access to the
    courts, he has failed to demonstrate an actual injury, such as the inability to file a complaint or non-
24  frivolous claim or loss of a case due to inability to file critical pleadings. *Lewis v. Casey*, 518 U.S.
    353.
25

26      [8]To the extent Mr. Spicer is attempting to revisit his claim that SCC's Policy 236 Resident
    Levels of Privilege system is unconstitutional, the court has already rejected this argument.  (Dkt. #
27  24, pp. 9-10).

28  REPORT AND RECOMMENDATION - 16

Spicer nor does he offer any evidence to support a finding of any unconstitutional condition of confinement.

**C.      First Amendment - Religion and Freedom of Assembly**

Plaintiff alleges that he has "been barred from having a daily bible reading with two or three other residents." (Dkt. # 6, ¶ 18).

Under the Constitution, "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments." *Pierce v. County of Orange*, 526 F.3d 11901209 (9th Cir. 2008) (addressing the rights of pretrial detainees) (citing *Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972) (addressing the rights of convicted prisoners)). However, as with other First Amendment rights in the inmate context, detainees' rights may be limited or retracted if required to "maintain [ ] institutional security and preserv[e] internal order and discipline." *Bell v. Wolfish*, 441 U.S. 520, 549 (1979); see, e.g., *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir.1997).  Restrictions on access to "religious opportunities" – whether group services, chapel visits, or meetings with religious advisers – must be found reasonable in light of four factors: (1) whether there is a "valid, rational connection" between the regulation and a legitimate government interest put forward to justify it; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) whether accommodation of the asserted constitutional right would have a significant impact on guards and other inmates; and (4) whether ready alternatives are absent (bearing on the reasonableness of the regulation).  *Turner v. Safley*, 482 U.S. 78, 89-90 (1987); *see also Beard v. Banks*, 548 U.S. 521 (2006); *Mauro v. Arpaio*, 188 F.3d 1054, 1058-59 (9th Cir.1999) (en banc). Further, because we are dealing with pre-trial detainees, to satisfy substantive due process requirements the restriction or regulation

REPORT AND RECOMMENDATION - 17

cannot be intended to serve a punitive interest. *Bell,* 441 U.S. at 535.[9]

In his motion for summary judgment, Dr. Richards asserts that Mr. Spicer is provided with an opportunity to practice his religion.  The evidence provided by Defendant reflects that SCC supports residents' religious exercise (Dkt. # 36, ¶ 2; Dkt. # 34, Exhs. 2, 6, 7, 8, 9, 10), and that religious activities and programs are under the direction of the SCC chaplain.  *Id*., ¶ 2.   The evidence also reflects that religious group meetings may be supervised to maintain a therapeutic treatment environment, to protect vulnerable or special needs residents from other resident's exploitation guised as religious activities, and to avoid religious meetings being used as a ruse to undermine the safety and security of SCC residents and staff. *Id*.

Due to Plaintiff's sexual offense history, grooming behaviors and use of his "ministry" to engage in grooming behaviors with vulnerable residents, there is a valid, rational justification in directing Plaintiff to first coordinate his "ministry" through the Chaplain's office.  The evidence reflects that Plaintiff remains able to attend worship services and to engage in religious activities yet this coordination through the Chaplain's office serves to limit Plaintiff's opportunity to use his ministry to groom residents and staff.

Mr. Spicer does not allege nor offer any evidence that he is denied the opportunity to practice his religion.  Therefore, the undersigned finds that even if Mr. Spicer is denied the ability to read the bible with two or three other residents as he alleges, his constitutional rights have not been violated.

## V.  CONCLUSION

---

[9]As noted by the Court in *Pierce*, the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq. ,* requires the government to meet a higher burden of proof than the rational basis standard of *Turner. See Greene v. Solano County Jail,* 513 F.3d 982 (9th Cir.2008).  Like the plaintiff in that case, Mr. Spicer has not brought a RLUIPA claim, thus only the constitutional analysis and the *Turner* standard applies here.

For the reasons stated above the Court should **GRANT** Defendant Richards' motion for summary judgment (Dkt. # 34) and dismiss Plaintiffs' claims against him with prejudice.  A proposed order accompanies this Report and Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report and Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **August 1, 2008**, as noted in the caption.

DATED this  8th   day of July, 2008.


Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 19